## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**GLOBAL ENERGY SERVICES, INC.**

**VERSUS**

**US APPLICATORS, LLC**

**CIVIL ACTION**

**NO. 18-512-JWD-EWD**

## RULING AND ORDER

This matter comes before the Court on *US Applicators LLC's* ("US Applicators" or "Defendant") *Motion for Partial Summary Judgment on Breach of Contract*. (Doc. 38.)  Plaintiff Global Energy Services, Inc. ("Global" or "Plaintiff") opposes the motion (Doc. 48), and US Applicators has filed a reply (Doc. 51).  Oral argument is not necessary.  The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule.

### I.  Introduction

Global entered into a Contract Order with Entergy Louisiana, LLC ("Entergy") to perform vegetation management work along Entergy's rights of way.  Global then entered into a Subcontract with US Applicators under which US Applicators would perform some of Global's work for Entergy (specifically, applying foliar herbicide).

The central issue in this motion is whether all reasonable jurors would conclude that the Subcontract was unambiguous with respect to how US Applicators was to be paid.  US Applicators argues that the Subcontract is unambiguous and that they should be paid "at the contracted rate for the number of line miles Global assigned to US Applicators."  This is because:

(1) The Subcontract says that US Applicators shall be paid for the same quantities of work that Entergy pays to Global, and the prime contract between Entergy and Global requires payment by the line mile; and

(2) US Applicators is obligated to guarantee that 100% of the line miles Global assigned to US Applicators met Entergy's specifications, which require 100% herbicide coverage with 95% efficacy. Thus, if any line Global assigned US Applicators failed to meet these standards, Global could require US Applicators to retreat the lines at US Applicators' expense.

Global responds that the Subcontract only required Global to pay US Applicators for the total miles in each circuit that US Applicators sprayed with herbicide. According to Global, if there was no spraying in a given mile, then there should be no billing. Global argues that the Subcontract is ambiguous, or, at the very least, unambiguous in a way that supports Global's argument.

Having carefully considered the matter, the Court finds that US Applicators has the better position. All reasonable jurors would find that the Subcontract was unambiguous and that, within the four corners of that document, US Applicators was to be paid at the contracted rate for the number of line miles Global assigned to US Applicators. Global's position is wholly unsupported by the record (to which it provides few if any citations), contrary to the plain language of the agreement, leads to absurd consequences, and is at odds with the equities of the Subcontract. Accordingly, partial summary judgment is granted in US Applicators' favor on this issue.

## II.    Relevant Factual Background

### A.  The Contract Order

Effective December 15, 2016, Global entered into a Contract Order (the "Contract Order") with Entergy whereby Global would perform Vegetation Management services on Entergy's rights of way for 2017–18. (US Applicators' *Statement of Uncontested Material Facts* ("*SUMF*") ¶ 1, Doc 38-2; Global's *Concise Statement of Material Facts* ("*CSMF*"), Doc. 48-1.)[1] The Scope of

---

[1] Global failed to rebut virtually all of the factual assertions in US Applicators' *SUMF*. (*See CSMF*, Doc. 48-1.) The relevant local rule in effect at the time US Applicators filed its motion provided, "All material facts set forth in the statement required to be served by the moving party will be deemed admitted, for purposes of the motion, unless controverted as required by this Rule." M.D. La. LR 56(b) (2019); *see also AmeriHealth Caritas Louisiana, Inc. v.*

Work for the Contract Order included "network line mile trimming, reactive work, capital work, special projects, and small local storm work." (*SUMF* ¶ 2.)  The network line mile trimming generally is the tree trimming along the right of way, while reactive work, capital work, special projects, and small storm work are one-off projects that Global performs in addition to the line-mile trimming. (*SUMF* ¶ 3.)

Under the Contract Order, Global was awarded network line mile trimming on nine different Networks over the 2017–18 timeframe: Amite/Bogalusa; Bastrop; Denham Springs/Gonzales; Hammond; Lafayette; Lake Charles/Sulphur; Port Allen/Zachary; West Monroe; and Labadieville/Reserve. (*SUMF* ¶ 4.)  Each Network is comprised of multiple "Circuits," or "area[s] from a substation that feeds a certain amount of customers." (*SUMF* ¶ 5.)

### B.  The Subcontract - Generally

On May 5, 2017, Global and US Applicators executed a Subcontract Agreement ("Subcontract") whereby US Applicators would apply "herbicide/pesticide along Entergy right of way as identified by GES project personnel." (*SUMF* ¶ 6.)  The Subcontract provides that it is to be construed in accordance with Maine law. (*SUMF* ¶ 7.)

Mario Martinez was one of the "GES project personnel" who assigned work to US Applicators. (*SUMF* ¶ 8.)  Martinez explained that he assigned circuits to US Applicators by providing a map of the circuit and, at US Applicators' request, provided the total feeder miles.

---

*Promise Hosp. of Ascension, Inc.*, No. 16-484, 2018 WL 1370599, at *1 n.1 (M.D. La. Mar. 16, 2018) (deGravelles, J.).  As a result, the Court will deem almost all of the facts in US Applicators' *SUMF* admitted for purposes of this motion. *See AmeriHealth*, 2018 WL 1370599, at *1 n.1.

  Further, the Court notes that Global failed to provide almost any record citations in its memorandum in support and its *CSMF* in violation of the Rule 56. *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, . . ."); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citations and quotations omitted).  Nevertheless, the Court has thoroughly reviewed the extrinsic evidence submitted by Global. (*See* Pl. Ex. B, Aff. of Kevin Pomerleau, Doc. 48-3; Dep. of Steven Hoover, Doc. 48-4.)  However, the Court need not supplement its presentation of the facts with this evidence because, as will be explained below, (1) the Court finds that the Subcontract is unambiguous as a matter of law, and thus (2) no parole evidence is admissible to interpret this agreement.

(*SUMF* ¶ 9.)  At times Global only assigned partial circuits to US Applicators because a portion of the circuit had already been completed by Global and approved by Entergy. (*SUMF* ¶ 10.)

Section 1.1 of the Subcontract provides, "The Contractor [Global] employs the Subcontractor [US Applicators] as an independent contractor to perform all work set forth in Exhibit A, . . . (hereinafter called Subcontractor's Work), a part of the work that the Contractor has contracted with the Owner [Entergy] to provide on the Project." (*SUMF* ¶ 11; Def. Ex. D, USAPP000158, Doc. 34-5 at 1.)  Specifically, US Applicators' work was part of the network line mile trimming Global agreed to provide for Entergy under the Contract Order. (*SUMF* ¶ 12.)  US Applicators' work was unrelated to Global's reactive, capital, special project, or small local storm work. (*SUMF* ¶ 13.)

### C.  The Subcontract - Payment

Exhibit B to the Subcontract provided that US Applicators will be paid by the mile for "the Work performed," including "all operations required to complete the Work in conformance with the Contract Documents":

**EXHIBIT B**

**PAYMENT SCHEDULE**

Unit price payment for the Work performed, as identified below, shall constitute full compensation for performance of all operations required to complete the Work in conformance with the Contract Documents.

| Item # | Description | Qty | Unit | Unit Price |
|---|---|---|---|---|
| 1 | West Monroe, Winsboro, Bastrop | 1 | Mile | $ 240.00 |
| 2 | Hammond, Port Allen/Zachary, Lafayette, Lake Charles | 1 | Mile | $ 285.00 |
| | | | | |
| | | | | |
| ** Pricing for any circuit not listed above will need to be added to this subcontract agreement by addendum prior to executing work.** | | | | |

(*SUMF* ¶ 14; Def. Ex. D, USAPP000170, Doc 34-5 at 13.)

Exhibit B further provides, "Determination of the mileage complete for the purposes of payment will be subject to approval of the Owner.  The Subcontractor will be paid for the quantities of work that the Owner pays the Contractor."  (*SUMF* ¶ 15; Def. Ex. D, USAPP000170, Doc 34-5 at 13.)  Critically, US Applicators would be paid "for the quantities of work that Global is paid by Entergy. (*SUMF* ¶ 15.)

Exhibit B continues:

The payment terms will be net forty-five (45) days.  In no case will Contractor retain funds from Subcontractor at a higher percentage than that being withheld from Contractor by Owner.  The Subcontractor acknowledges that his pricing includes everything required for the complete prosecution of the Work as stated in the Agreement.

(*SUMF* ¶ 16; Def. Ex. D, USAPP000170, Doc 34-5 at 13.)  Thus, the Subcontract prohibits Global from withholding funds "at a higher percentage than that being withheld from" Global by Entergy. (*SUMF* ¶ 16.)

The Contract Order between Global and Entergy is expressly incorporated into and made a part of the Subcontract. (*SUMF* ¶ 17.)  Global's pricing for network line mile trimming is set forth in Exhibit B to the Contract Order:

**EXHIBIT B – COMPENSATION**

**Network Pricing:**

| Network | | Per line mile price |
|---|---|---|
| Amite/Bogalusa | $ | 3,404.00 |
| Bastrop | $ | 2,100.00 |
| DS - Gonzales | $ | 3,797.00 |
| Hammond | $ | 4,168.00 |
| Lafayette | $ | 2,317.00 |
| Lake Charles/Sulphur | $ | 2,475.00 |
| Port Allen/Zachary | $ | 3,335.00 |
| West Monroe | $ | 3,357.00 |

(*SUMF* ¶ 18.)  Thus, the unit of work for which Global was paid under the Contract Order was "line mile." (*SUMF* ¶ 18.)

### D.  The Subcontract – US Applicators' Obligations

Other provisions govern US Applicators' obligations under the Subcontract.  Specifically, both Section 1.1 and Exhibit A of the Subcontract require US Applicators to perform its work in compliance with the Contract Order. (*SUMF* ¶ 19.)  Similarly, Section 1.2 imputes to US Applicators any obligation Global owes to Entergy:

> 1.2     Any and all obligations of the Contractor to the Owner created by the terms and conditions of the prime Contract shall be binding upon the Subcontractor to the full extent as if the Subcontractor were the Contractor, and the applicable terms and conditions of the prime Contract are herein incorporated by reference and made a part of this agreement.

(*SUMF* ¶ 20.)

Section 1.3 of the Subcontract requires US Applicators to abide by the specifications that govern the Contract Order between Entergy and Global insofar as they relate to the work to be accomplished by US Applicators:

> 1.3     The Subcontractor agrees to be bound by all the specifications, drawings and regulations governing the prime Contract between the Contractor and the Owner insofar as they relate to the work to be accomplished and materials to be supplied by the Subcontractor under the Contract, and all of said documents are herein incorporated by reference and made a part of this Agreement.

(*SUMF* ¶ 21.)

Section 1.16 of the Contract Order requires compliance with the specifications published in the Distribution Vegetation Management Line Clearance Specifications ("Entergy's Specifications"):

> **1.16 Contractor Requirements**
>
> A.  All work shall be completed in accordance with, but not limited to:
>
>   1.  User's Specifications that are published in the Distribution Vegetation Management Line Clearance Specifications.  (available upon request)

(*SUMF* ¶ 22, Def. Ex. C, GES 000046, Doc. 38-5 at 4.)     The second page of Entergy's Specifications provides that "Work performed on all Contract Orders written for Distribution Vegetation Management shall conform to these Specifications." (*SUMF* ¶ 23; Def. Ex. F-1, Doc. 38-10 at 2.)

Section 4 of Entergy's Specifications relates to the use of herbicides. (*SUMF* ¶ 24.) Section 4 provides in full:

**4.0 USE OF HERBICIDES**

4.0.1    The use of herbicides is preferred for floor where possible. Other methods (e.g., mowing, jaraff, bucket, manual, etc.) should only occur in areas where herbicide use is prohibited due to site restrictions, customer refusal, label restrictions and/or size of the brush restricts access for normal line maintenance. Mechanical/Manual brush removal in lieu of herbicide shall be approved by designated company representative.

4.0.2 All herbicide work will be performed with guarantees of 100% coverage at time of application and a minimum of a 95% efficacy in the following growing

season. Any necessary retreatments the following growing season will be done at contractor expense.

4.0.3 All herbicides used must be on Entergy's Approved Herbicide List. Herbicide application will be done in accordance with all label directions, and in compliance with all local, state and federal laws.

(*SUMF* ¶ 25; Def. Ex. F-1, Doc. 38-10 at 4.)   Thus, Section 4.0.2 of Entergy's Specifications require, "All herbicide work [to be] performed with guarantees of 100% coverage at the time of application and a minimum of 95% efficacy in the following growing season." (*SUMF* ¶ 25; Def. Ex. F-1, Doc. 38-10 at 4.)   Section 4.0.2 of Entergy's Specifications continues, "[a]ny necessary retreatments the following growing season will be done at contractor expense." (*SUMF* ¶ 26; Def. Ex. F-1, Doc. 38-10 at 4.)

### E.  The Dispute

US Applicators issued periodic invoices to Global, billing at the contracted rate for the total number of line miles assigned, which US Applicators contends is in accordance with the Subcontract. (*SUMF* ¶ 27.)  Global has refused to produce or remit payment to US Applicators for any of the Invoices. (*SUMF*  ¶28.)

### III.    Relevant Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a

'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations

and internal quotations omitted). "Where the record taken as a whole could not lead a rational trier

of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec.*

*Indus. Co.*, 475 U.S. at 587. Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of
> the witnesses, weigh the evidence, or resolve factual disputes; so long as the
> evidence in the record is such that a reasonable jury drawing all inferences in favor
> of the nonmoving party could arrive at a verdict in that party's favor, the court must
> deny the motion.

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991) (citations

omitted).

## IV.    Discussion

### A.  Parties' Arguments

#### 1. US Applicators' Original Motion and Memorandum (Docs. 38, 38-1)

In bringing this motion for partial summary judgement, US Applicators has two main

contentions. First, the Subcontract between Global and US Applicators is unambiguous and states

that US Applicators "shall be paid for the same quantities of work that Entergy pays to Global[,]"

which means "payment by the line mile." (Doc. 38 at 1.) Second, Applicators argues that it was

obligated to guarantee "100% herbicide coverage with 95% efficacy" under the agreement and

would be obligated to remedy any deficiency at its own expense. (Doc. 38 at 1.) Thus, US

Applicators argues it would be unreasonable for Global to pay it for less than the miles assigned

because it "was responsible for ensuring 100% of those miles met Entergy's specifications." (Doc.

38 at 1.)

For its first argument, US Applicators contends that the Subcontract is unambiguous and

therefore no extrinsic evidence should be allowed to determine the parties' intent. (Doc. 38-1 at

2.) US Applicators maintains that the terms of the Subcontract are to be interpreted in accordance with Maine law. (Doc. 38-1 at 8.) It further cites cases from the federal First Circuit and Maine state courts which put forth general contract interpretation principles. (Doc. 38-1 at 8.)   US Applicators notes that "[c]ontract language is ambiguous if the terms are inconsistent on their face, or if the terms allow reasonable but differing interpretations of their meaning." (Doc. 38-1 at 8 (citations and quotations omitted).) US Applicators argues that "Exhibit B to the Subcontract provided that US Applicators will be paid by the mile for 'all operations required to complete the Work in conformance with the Contract Documents' ". (Doc. 38-1 at 9.) Thus, US Applicators contends that the contract provides for payment in line miles and that "Exhibit B explicitly provides that US Applicators will be paid for the quantities of work that Global is paid by Entergy." (Doc. 38-1 at 9.) US Applicators argues that this is supported by the fact that Entergy pays Global per circuit based on a per line mile price. (Doc. 38-1 at 11.) Applicators urges that "the unambiguous language of the Subcontract requires Global to pay US Applicators for the same quantities (or miles) of work that Entergy pays Global." (Doc. 38-1 at 12.) US Applicators notes that Global did not assign every circuit it had under its Contract with Entergy, and that it did not assign portions of circuits which had been completed by Global and approved by Entergy before assignment. (Doc. 38-1 at 12.) US Applicators argues that it should be paid for the miles assigned, including "open miles," by Global. (Doc. 38-1 and 12.)

For its second argument, US Applicators contends that the only reasonable interpretation of the Subcontract, considering their alleged liability under the agreement, is that they be paid for the miles assigned. (Doc. 38-1 at 13.) US Applicators argues that under the terms of the Subcontract, it is required to perform the herbicide application in compliance with Entergy standards. (Doc. 38-1 at 13.) It further argues that Section 1.2 of the Subcontract makes the terms

of the original Contract between Global and Entergy binding on US Applicators. (Doc. 38-1 at 13.) Under Section 1.3 of the Subcontract, US Applicators argues it was required to abide by the specifications of the original contract with Entergy which includes the Vegetation Management specifications. (Doc. 38-1 at 14-15.) Specifically, the Entergy specifications require " 'guarantees of 100% coverage at the time of application and a minimum of 95% efficacy in the following growing season.' " (Doc. 38-1 at 15.) US Applicators contends that that it would be obligated under the Subcontract to remediate any deficiency at its own expense. (Doc. 38-1 at 16.) Additionally, it would have to inspect the entire assigned circuit, just to determine what brush needed to be sprayed. (Doc. 38-1 at 16.) In light of these provisions, US Applicators contends that "the only reasonable interpretation of the compensation provision of the Subcontract . . . [is] to compensate US Applicators for the total number of line miles assigned. . ., the total number of line miles US Applicators guaranteed to satisfy Entergy's Specifications." (Doc. 38-1 at 16.)

### 2. Global's Opposition (Doc. 48)

Global responds that it is only obligated to pay for the miles that US Applicators actually sprayed under the Subcontract. (Doc. 48 at 3.) It notes that the difference in rate between what Entergy payed Global and what Global was supposed to pay US Applicators was due to additional work, such as tree trimming and other right of way maintenance, that Global performed under the agreement. (Doc. 48 at 3.) Global argues that the "Contract does not authorize payment under the Subcontract for the mile" "if it did not spray in a particular mile". (Doc. 48 at 3.) Global contends that "US Applicators was only paid for the work it did in each mile [under the Subcontract], not the number of trees it sprayed in a mile nor the number of miles on which no trees were sprayed." (Doc. 48 at 3.) It further argues the Subcontract was clear and that under the specific language, although not cited, that US Applicators is only paid for the brush sprayed in a mile. (Doc. 48 at 4.)

Global "concedes its Subcontract between the parties is unambiguous" although it argues that US "Applicators' interpretation makes it unclear." (Doc. 48 at 4.) Global notes that the work order map provided by Entergy shows the entire circuit, including open miles which do not require spraying. (Doc. 48 at 4.) Further, it argues that the Subcontract "clearly and unambiguously does not pay [US] Applicators for spraying brush that did not occur in a particular mile within a circuit." (Doc. 48 at 5.) Global notes that it would get paid by Entergy for "all of its other work in the miles it performed under the Contract", even if US Applicators did no spraying in that week. (Doc. 48 at 5.) Accordingly, it argues that US Applicators interpretation of the sentence in the Subcontract that states "[t]he Subcontractor will be paid for the quantities of work that the Owner pays the Contractor" (Doc. 48 at 4.) is "contrary to the clear and unambiguous language" and "makes the sentence ambiguous and incorrect." (Doc. 48 at 6.) Global argues that because the scope of work was different between the Subcontract with Global and US Applicators and the Contract between Global and Entergy, the payment should not necessarily be the same even with the sentence in the Subcontract. (Doc. 48 at 9.) Since US Applicators "creates a different interpretation of the sentence", "extrinsic evidence is allowed to show the parties intention", in the form of an affidavit from Kevin Pomerleau. (Doc. 48 at. 6.)

In support of its pay-per-spray argument, Global notes that it "provides [US] Applicators the circuit where the spraying of brush was to occur" and then "Entergy pays Global on a per mile basis which Global pays to [US] Applicators for miles worked." (Doc. 48 at 7.) It argues that US Applicators billed for total miles in each circuit even if not sprayed, but that under the Subcontract it only had to pay the bill for miles in which spraying occurred. (Doc. 48 at 7.) According to Global, it requested the actual miles sprayed but US "Applicators admitted they did not identify the location nor the individual mile for brush" but still billed for every mile. (Doc. 48 at 7.) Global

claims that it attempted to compromise and "offered to pay the amount per mile as though each mile in the circuit would have a brush within it" that was not an open mile. (Doc. 48 at 8.)

Regarding US Applicators argument on the warranty, Global notes the Subcontract "unambiguously requires [US] Applicators to perform work according to Entergy's specifications" and that because US Applicators performed work directly with Entergy, it was aware of the specifications and warranties required. (Doc. 48 at 6.) However, it argues the requirements "do not alter the basic terms of Global's Contract with its Subcontractor." (Doc. 48 at 6.) Global avers that the "reference only requires a Subcontractor to be obligated to Global as the Contract has agreed to perform for Entergy on the specific referenced matters only!" (Doc. 48 at 6.) Global argues that the "Entergy Contract and the Subcontract are totally separate contractual obligations between two different parties" and that any assumption of responsibility by US Applicators does not "alter [US] Applicators['] scope of work on the amount it is paid." (Doc. 48 at 8-9.) Considering its earlier contention that the Subcontract is clear that US Applicators is only payed for actual spraying, Global thus avers that US Applicators only assumed the warranty responsibilities for sprayed areas, not just miles assigned in which no work was done. (Doc. 48 at 8-9.)

Finally, Global refers to the death of trees near the right-of-way which it argues occurred as the result of US Applicators' herbicide application. (Doc. 48 at 8.) Global states that it removed the trees at its expense and therefore should be allocated a setoff for any money which Global may owe under the Subcontract to US Applicators. (Doc. 48 at 8.) Global "submits a genuine issue of material fact exists and the motion should be denied." (Doc. 48 at 10.)

### 3. US Applicators' Reply

In its reply, US Applicators argues that its interpretation of the contract, and not Global's, "is . . . supported by the clear language of the contract". (Doc. 51 at 1.) Furthermore, US

Applicators contends Global has raised no "reasonable counter-interpretation of the Subcontract, supported by competent summary judgement evidence and language from the Subcontract." (Doc. 51 at 1.) Additionally, US Applicators asserts that Global agrees there is no ambiguity in the contract, and that although Global is not obligated to pay the same rate it receives from Entergy, it is required to pay for the same number of miles received that it assigns to US Applicators. (Doc. 51 at 4.)

### B.  Applicable Law

Preliminarily, both sides agree that the Subcontract is governed by Maine law. (*See SUMF* ¶ 7, Doc. 38-2 at 2; *CSMF*, Doc. 48-1.)  As a result, the Court declines to engage in an extensive conflicts of law analysis under La. Civ. Code arts. 3540 and 3537.  Nevertheless, the Court notes that the laws of Louisiana and Maine are remarkably similar with respect to the interpretation of contracts and the use of parole evidence.

Specifically, under Maine law, if the contract is unambiguous, interpretation is a question of law. *Am. Prot. Ins. Co. v. Acadia Ins. Co.*, 2003 ME 6, ¶ 11, 814 A.2d 989, 993 (Me. 2003). If not, interpretation must be left to the fact finder. *Id.* "The interpretation of ambiguous language in a contract . . . is a question of fact." *Farrington's Owners' Ass'n v. Conway Lake Resorts, Inc*., 2005 ME 93, ¶ 10, 878 A.2d 504, 507.

Interpretation is done "by looking at 'the whole instrument' and giving 'force and effect to all of its provisions.' " *Farrington's Owners'*, 2005 ME 93, ¶ 13, 878 A.2d at 508 (citing *Am. Prot. Ins. Co.*, 2003 ME 6, ¶ 12, 814 A.2d at 993). Furthermore, "[t]he plain language of a contract should not be 'stretched or tortured to provide meaning sufficient' to advance one party's interpretation." *Farrington's Owners'*, 2005 ME 93, ¶ 12, 878 A.2d at 508 (citing *City of Augusta v. Quirion*, 436 A.2d 388, 394 (Me. 1981)). " 'A contract is to be interpreted to effect the parties'

14

intentions as reflected in the written instrument, construed with regard for the subject matter, motive, and purpose of the agreement, as well as the object to be accomplished.' " *Eastwick v. Cate St. Capital, Inc.*, 2017 ME 206, ¶ 16, 171 A.3d 1152, 1156, *modified* (Nov. 30, 2017) (citing *V.I.P., Inc. v. First Tree Dev. Ltd. Liab. Co.*, 2001 ME 73, ¶ 3, 770 A.2d 95). "Moreover, courts should not rewrite contracts, particularly agreements between two corporations acting at arms length." *Portland Valve, Inc. v. Rockwood Sys. Corp.,* 460 A.2d 1383, 1388 (Me. 1983).

Ultimately, the "language in a contract should be given its plain meaning." *Am. Prot. Ins.,* 2003 ME 6, ¶ 13, 814 A.2d at 993 (citing *Portland Valve*, 460 A.2d at 1387). " 'Language is considered to be ambiguous if it is reasonably susceptible to different interpretations.' " *Farrington's Owners'*, 2005 ME 93, ¶ 10, 878 A.2d at 507 (citing *Acadia Ins. Co. v. Buck Constr. Co.*, 2000 ME 154, ¶ 8, 756 A.2d 515, 517). " 'The fact that parties have different views of what an agreement means does not render it ambiguous.' " *Eastwick*, 2017 ME 206, ¶ 17, 171 A.3d at 1156 (citing *Champagne v. Victory Homes, Inc.*, 2006 ME 58, ¶ 10, 897 A.2d 803).

Maine also adheres to the general parole evidence rule and restricts the introduction of extrinsic evidence to interpret unambiguous language in the contract. "Once an ambiguity is found then extrinsic evidence may be admitted and considered to show the intention of the parties." *Portland Valve,* 460 A.2d at 1387. However, "[t]he interpretation of an unambiguous contract 'must be determined from the plain meaning of the language used and from the four corners of the instrument without resort to extrinsic evidence.'" *Am. Prot. Ins.*, 2003 ME 6, ¶ 11, 814 A.2d at 993 (citing *Portland Valve,* 460 A.2d at 1387). "In the absence of any express language or of any ambiguous language, which would permit the admission of relevant extrinsic evidence, . . . the court will not lightly import meaning into the contract." *Portland Valve*, 460 A.2d at 1388. Furthermore, "a contracting party's professed intent cannot contradict the inexorable purport of

15

written contractual provisions." *Elliott v. S.D. Warren Co.*, 134 F.3d 1, 9 (1st Cir. 1998). The federal First Circuit has noted in a contract dispute that summary judgement would be affirmed "when the words of a contract are so clear that 'reasonable people could not differ over their meaning.' " *Id.* at 10 (citing *Boston Five Cents Sav. Bank v. Secretary of Dep't of HUD*, 768 F.2d 5, 8 (1st Cir.1985)).

###    C.  Analysis

Having carefully considered the matter, the Court will grant US Applicators' motion.  The Court first finds that all reasonable jurors would conclude that the Subcontract is unambiguous and should be interpreted as US Applicators advances.

Again, Exhibit B specifically provides, "Unit price payment for the Work performed, as identified below, shall constitute full compensation for performance of all operations required to complete the Work in conformance with the Contract Documents." (*SUMF* ¶ 14; Def. Ex. D, USAPP000170, Doc 34-5 at 13.)   The "Unit" listed is "Mile":

**EXHIBIT B**

**PAYMENT SCHEDULE**

Unit price payment for the Work performed, as identified below, shall constitute full compensation for performance of all operations required to complete the Work in conformance with the Contract Documents.

| Item # | Description | Qty | Unit | Unit Price |
|---|---|---|---|---|
| 1 | West Monroe, Winsboro, Bastrop | 1 | Mile | $ 240.00 |
| 2 | Hammond, Port Allen/Zachary, Lafayette, Lake Charles | 1 | Mile | $ 285.00 |
| | | | | |
| | | | | |
| ** Pricing for any circuit not listed above will need to be added to this subcontract agreement by addendum prior to executing work. ** | | | | |

16

(*SUMF* ¶ 14; Def. Ex. D, USAPP000170, Doc 34-5 at 13.)   Even more importantly, the Subcontract also states, "The Subcontractor will be paid for the quantities of work that the Owner pays the Contractor."  (*SUMF* ¶ 15; Def. Ex. D, USAPP000170, Doc 34-5 at 13.)

Entergy's payments to Global are clearly an unambiguously set forth in the Contract Order, which is expressly incorporated into the Subcontract. (*SUMF* ¶ 17.)  Compensation under the Contract Order is described in Exhibit B to that document, and it is listed as "Per line mile":

**EXHIBIT B – COMPENSATION**

**Network Pricing:**

| Network | | Per line mile price |
|---|---|---|
| Amite/Bogalusa | $ | 3,404.00 |
| Bastrop | $ | 2,100.00 |
| DS - Gonzales | $ | 3,797.00 |
| Hammond | $ | 4,168.00 |
| Lafayette | $ | 2,317.00 |
| Lake Charles/Sulphur | $ | 2,475.00 |
| Port Allen/Zachary | $ | 3,335.00 |
| West Monroe | $ | 3,357.00 |

(*SUMF* ¶ 18.)

Lastly, the Subcontract provided that US Applicators would apply "herbicide/pesticide along Entergy right of way *as identified by GES project personnel*." (*SUMF* ¶ 6 (emphasis added).)  Thus, US Applicators would only be responsible for those "line miles" assigned to it by Global personnel.

Reading these provisions together, all reasonable jurors would conclude that the agreements clearly and unambiguously require Global to pay US Applicators for the "quantities of work that the Owner pays the Contractor," which is the "line miles" Global assigned to US Applicators.  Phrased another way, the only reasonable interpretation of these contract documents

is that the unit ("Mile") in Exhibit B of the Subcontract means "line mile" assigned to US Applicators by Global.

Global's alternative position is wholly unsupported by the record, contrary to the plain language of the Subcontract, and leads to absurd consequences against the equities of the agreements. First, Global argues that, under the Subcontract, it only had to pay US Applicators for the miles sprayed. Again, "the fact that parties have different views of what an agreement means does not render it ambiguous,' " *Eastwick*, 2017 ME 206, ¶ 17, 171 A.3d at 1156 (cleaned up), and "language is considered to be ambiguous if it is reasonably susceptible to different interpretations.' " *Farrington's Owners'*, 2005 ME 93, ¶ 10, 878 A.2d at 507 (cleaned up). Here, Global cites to almost no specific language of the contract documents supporting its interpretation. This is critical because, as the Fifth Circuit has stated:

> [U]nsubstantiated assertions are not competent summary judgment evidence. The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.

*Ragas v. Tennessee Gas Pipeline Co*., 136 F.3d 455, 458 (5th Cir. 1998) (cleaned up). Without more, Global fails to create a genuine issue of material fact and demonstrate any ambiguity in US Applicators' proposed interpretation of the Subcontract.

Second, Global's position runs contrary to the clear and unambiguous provisions of the Subcontract listed above. Global relies on the affidavit of its President Kevin Pomerleau (Doc. 48-3), but Maine law prohibits the use of such extrinsic evidence to interpret unambiguous contracts. *See Am. Prot. Ins.*, 2003 ME 6, ¶ 11, 814 A.2d at 993; *Portland Valve*, 460 A.2d at 1388. And this is particularly important given the fact that, under Maine law, "courts should not rewrite contracts, particularly agreements between two corporations acting at arms length." *Id.*

Further, the Court notes that most of this affidavit is irrelevant, and some of it even supports US Applicators' position.  Much of the affidavit disputes the *rate* that Global was to pay US Applicators per line mile, arguing that Global was justifiably paid more than US Applicators. (Pl. Ex. B, Pomerleau Aff. ¶¶ 5, 6, 8, Doc 48-3.)  But Global is primarily focused on the unit of payment—"the contracted rate for the number of line miles Global assigned to US Applicators," (Doc. 38 at 1.)  Moreover, another part of the affidavit actually helps US Applicators; Pomerleau attests:

> Affiant states the payment to Global under the Entergy Contract are set forth on Exhibit B of the Entergy Contract *which provides for Global to be paid per line mile* for each Network in the amount per line mile shown for each particular Network in which payments for the work performed is a fixed rate and is different on each Network in which the work is performed;

(Pl. Ex. B, Pomerleau Aff. ¶ 3, Doc 48-3 (emphasis added).)  Thus, Global concedes the manner in which it was paid by Entergy—per line mile—and, when combined with the fact that the Subcontract states, "The Subcontractor  will be paid for the quantities of work that the Owner pays the Contractor,"  (*SUMF* ¶ 15; Def. Ex. D, USAPP000170, Doc 34-5 at 13), this further supports the conclusion that US Applicators too was to be paid per line mile which Global assigned to it.

And third, the Court notes that Global's position runs contrary to the equities of the Subcontract and would lead to absurd consequences.  As explained above, US Applicators had to perform the Subcontract according to Entergy's Specifications (*SUMF* ¶¶ 21, 22), and these specifications provide in relevant part:

> 4.0.2 All herbicide work will be performed with guarantees of 100% coverage at time of application and a minimum of a 95% efficacy in the following growing season. Any necessary retreatments the following growing season will be done at contractor expense.

(*SUMF* ¶ 25; Def. Ex. F-1, Doc. 38-10 at 4.)  Thus, as US Applicators argues, the Subcontract contemplates US Applicators being paid per line mile rather than per mile sprayed.  US Applicators

ultimately "guarantees . . . 100% coverage at time of application and a minimum of a 95% efficacy in the following growing season." (*SUMF* ¶ 25; Def. Ex. F-1, Doc. 38-10 at 4.)  If US Applicators failed to perform to this standard, then it is liable for "[a]ny necessary retreatments the following growing season." (*SUMF* ¶ 25; Def. Ex. F-1, Doc. 38-10 at 4.)   Phrased another way, the clear and unambiguous language of the Subcontract provided that US Applicators was responsible for inspecting all line miles assigned and ensuring that they were sprayed with herbicide.  And, if any line mile required retreatment the following season, then US Applicators was responsible for doing so, at its expense.

Again, interpretation is done "by looking at 'the whole instrument' and giving 'force and effect to all of its provisions.' " *Farrington's Owners'*, 2005 ME 93, ¶ 13, 878 A.2d at 508.  US Applicators' position conforms to a proper reading of the Subcontract and other contract documents as a whole and gives full effect to these performance clauses, while Global's, on the other hand, results in a windfall not contemplated by the Subcontract. (*See* Opposition, Doc. 48 at 7 ("Entergy pays Global *on a per mile basis* which Global pays to Applicators *for miles worked*" (emphasis added)).)   In short, US Applicators' is the only reasonable interpretation of the Subcontract as a whole.

For all these reasons, the Court finds that the Subcontract is unambiguous as a matter of law.  Under the relevant contracts, US Applicators is to be paid at the contracted rate for the number of line miles Global assigned to it.  US Applicators is thus entitled to partial summary judgment on this issue.

## V.    Conclusion

Accordingly,

20

**IT IS ORDERED** that *US Applicators LLC's Motion for Partial Summary Judgment on Breach of Contract* ("Doc. 38) is **GRANTED**.  The Court finds that, as a matter of law, the compensation provision of the Subcontract between the parties is unambiguous, and Global must pay US Applicators at the contracted rate for the number of line miles Global assigned to US Applicators.

Signed in Baton Rouge, Louisiana, on <u>March 5, 2020</u>.


_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

21